Estate of A. F. Morlan, Deceased, Morlan Visel, Administrator With-the-Will-Annexed v. Commissioner.
Estate of Morlan v. Commissioner
Docket No. 108774.
United States Tax Court
1943 Tax Ct. Memo LEXIS 32; 2 T.C.M. (CCH) 1111; T.C.M. (RIA) 43507; December 14, 1943
*32 Dana Latham, Esq., 1112 Title Guarantee Bldg., Los Angeles, Calif., and Austin H. Peck, Jr., Esq., for the petitioner. T. M. Mather, Esq., for the respondent. TURNER
Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in income tax against petitioner for the calendar year 1939 in the amount of $16,385.35. The question presented is whether the petitioner sustained a deductible loss in respect of certain corporate stock. Findings of Fact A. F. Morlan was a resident of Los Angeles, California, at the time of his death on April 14, 1940. On May 24, 1940, Margaret Nicholls Morlan, a resident of Los Angeles, was duly appointed, and qualified, as executrix of decedent's estate. She served in that capacity until her death on December 24, 1941. On February 16, 1942, the Superior Court of the State of California appointed Morlan Visel, as the Administrator With-the-Will-Annexed. Morlan Visel qualified as administrator, and is now, and ever since has been acting in that capacity. He was duly substituted as petitioner herein. During the year 1936 Morlan, who was president of the Title Guarantee & Trust Company of Los Angeles, and a man of considerable *33 means, was financially interested, with R. W. McBurney, and John A. Phillips, in an oil drilling project in Corizzo Plains, just west of McKittrick, California, which venture was unsuccessful. Wayne Loel, a consulting geologist, had been engaged by McBurney to perform the geological work on that project and in connection therewith, first met Morlan. Prior to 1937, Loel had carried on the geological work which led to the discovery of the Wilmington oil field near Los Angeles, and had secured many leases in this field for the Bankline Oil Company. Early in 1937 he and the Bankline Oil Company reached an agreement as to his compensation, the terms thereof being set forth in a letter dated January 25, 1937, and hereinafter referred to as the Bankline contract. This contract provided for certain payments to be made to Loel out of oil productions from approximately 800 acres. It provided that the Bankline Oil Company was to drill and otherwise develop the leases mentioned in the contract, paying the expenses thereof wholly from its own funds. At such time as the company had recovered for itself all of such expenses, so that a profit was being realized from the operation of the leases, then *34 and from that time on, Loel was to receive a portion of that profit. The company reserved the right under the contract to drill additional wells or to deepen existing wells, thereby incurring additional expenses and thus reducing or cutting off entirely the payment of any amounts to Loel until such additional expenses had been recovered. Under the contract Loel was permitted to have certain leases in the Wilmington field as his own, which he could develop and operate, and he and McBurney decided to form a corporation for that purpose. J. A. Brantly, president of the Drilling and Exploration Company, and a friend of Loel's was to be taken into the organization. It was contemplated that Brantly would make a contribution to the company by taking care of the drilling of the wells, either for an interest in the company or at reduced rates, or on a time payment basis. John A. Phillips, who with McBurney had lost money in the Corizzo Plains project, approached McBurney with the idea of contributing to the new corporation, thinking that the new corporation might present an opportunity to recoup losses previously sustained. A copy of the articles of incorporation for the new corporation, *35 The Burnoel Petroleum Company, was filed in the office of the Secretary of State for California, on January 14, 1937. The authorized capital of the corporation consisted of 100 shares of no par value stock, the value for the shares being fixed at $1 per share. Loel became the president of the company, McBurney, vice president, and W. O. Maxwell, secretary and treasurer. On January 25, 1937, the corporation filed its application with the Commissioner of Corporations for the State of California, requesting authority to issue its 100 shares of authorized stock at $1 per share, 70 shares to Loel, 10 shares to Phillips and 20 shares to Brantly. On January 30, 1937, the Commissioner of Corporations issued the permit to the Burnoel Petroleum Company to sell its 100 shares of stock according to the terms of its application. It was contemplated that additional capital would be contributed to the corporation by the interested parties. On February 5, 1937, Loel and Phillips executed an agreement whereunder and whereby Phillips was to deposit $10,000 with a trustee, the said money to be expended in the payment of rental on leases already owned by Loel, for the purpose of obtaining further leases *36 and to cover expenses in connection with the development and operation of the leases. It was provided that the trustee should be the Burnoel Petroleum Company and that the leases in question should be assigned by Loel to that company, and further, that Loel would use his knowledge and efforts in securing other and additional leases in the Wilmington field or adjacent thereto. Loel thereafter made assignment of five leases to the corporation, and Phillips paid over the $10,000 in cash. The $10,000 was entered by the corporation on its books as donated surplus. On February 3, 1937, 70 shares of stock were issued to Loel and 11 shares to Phillips. Brantly wanted too much for drilling the necessary wells on the properties, and no stock was issued to him. On May 17, 1937, the remaining 19 shares were issued to Loel and Phillips, 16 1/2 and 2 1/2 shares, respectively. At the time the above leases were assigned by Loel to the corporation, between January 20 and April 27, 1937, he valued them at approximately $50,000. He received no consideration for the leases other than the stock which was issued to him by the corporation. As the result of Brantly's failure to participate in the venture, *37 the corporation had no credit when it began operations and had to look elsewhere for the money needed in carrying out its drilling program. It was then that Loel and McBurney talked with Morlan and reached an oral agreement with him, whereby he agreed to guarantee notes of the company which might be given to obtain money for such drilling expenses. The consideration for his agreement to guarantee the obligations of the company was 25 shares of the company's stock, which amounted to 25 percent of the total issued and outstanding stock. On March 10, 1937, 12 1/2 shares were issued to Morlan and 12 1/2 shares were issued to Rae M. Isaacs, Morlan's daughter and nominee. The shares so issued to Morlan and his nominee were transferred by Loel and Phillips from their holdings, and after the transfer the stock of the corporation was owned 62 shares by Loel, 13 shares by Phillips and 25 shares by Morlan. On April 30, 1937, the Burnoel Petroleum Company borrowed $35,000 from the Security-First National Bank of Los Angeles. On June 8, 1937, an additional $40,000 was borrowed and a new note for $75,000 was executed by the company. On July 13, 1937, the loan was increased to $100,000 and a note *38 for that amount was given. On August 16, 1937, the loan was increased to $125,000 and a note was executed for that amount. On March 31, 1938, the loan was increased to $155,000 and a note for that amount was given. Each of the said notes included the amount covered in the preceding note. On each of the dates mentioned, a general continuing guarantee for the indebtedness of Burnoel and in favor of the bank was signed personally by Morlan, Loel and McBurney. In obtaining the loans, Loel put up as collateral 59 shares of Burnoel stock owned by him. At the time the loan was increased to $155,000, he also put up as collateral his Bankline contract. The corporation posted as collateral its leases, a contract with Standard Oil Company and other items. Morlan posted as collateral various securities belonging to him, while McBurney posted no collateral at all. Under dates of August 17, 1937 and March 31, 1938, Morlan personally wrote letters of similar import to the bank, approving the assignment of the leases to the bank under the said notes and agreeing to hold the bank harmless against any liability, damage or expense which it might incur or which might arise out of or be in any way connected *39 with its acceptance or holding of the said leases. On January 27, 1938, Burnoel borrowed $15,000 from the Bank of America National Trust & Savings Association, Los Angeles, California. Morlan alone guaranteed payment of that note. In addition to the funds procured at the bank, Burnoel also received some advances from Morlan personally. He made three such advances fo $5,000 each, receiving at or about the date of each advance, a promissory note of the corporation for $5,000, the dates of the three notes being June 17, 1938, November 30, 1938, and February 24, 1939, respectively. One well was drilled on each of the five leases previously mentioned, all of which were producing wells. The average production at the beginning was about 400 barrels per day, but because of the sanding up of the wells, production fell off rapidly. Slow production might have avoided such sanding, but because of its existing indebtedness the company could not afford to slow down production. Rapid and full production was necessary if the company was to remain in a liquid condition. By the fall of 1938 Burnoel was in a bad financial condition. Its financial statement covering the period from January 14, 1937 *40 to November 30, 1938, showed a net loss from operations of $55,174.44. The notes of the company to the Security-First National Bank of $155,000 and to the Bank of America for $15,000 were unpaid. One of the above notes for $5,000 payable to Morlan was outstanding, and at or about that time Morlan made his second $5,000 advance to the company, and the note bearing date of November 30, 1938, was issued therefor. There were a number of other creditors, some of whom were pressing for payment of their claims. The officers of the company concluded it would be necessary to obtain additional financing and that this could be accomplished through a sale of stock to the public. Morlan consulted A. M. Fagan, a business counselor, and brought him in to promote the sale of the stock. An application was filed with the Commissioner of Corporations for the State of California in the fall of 1938, for the sale of stock to the public, and a permit therefor was issued. Two sales of stock were made in December 1938, one of 100 shares on December 20, and the other of 250 shares on December 22. It was concluded, however, that the assets of the company were insufficient to allow the sale of stock to the *41 public, and the stock selling plan was abandoned. The 250 shares sold on December 22 were repurchased the following day, and the 100 shares sold on December 20 were repurchased on February 23, 1939. Fagan was asked to stay on with the company and to work out some plan that would rescue it from its financial straits. As the situation then existed, the $155,000 note of the company held by the Security-First National Bank was due March 31, 1939, and as collateral, the bank was holding Loel's Bankline contract, certain securities of Morlan and the five oil leases which Loel had paid into the company at the time it was organized. The $15,000 note of the company held by the Bank of America was due and substantial amounts were also due to other creditors. One creditor had filed an attachment on some of the property of the company, and the National Supply Company, which had sold drilling equipment to Burnoel, was threatening to remove the equipment from the leases if the amount was not paid. Fagan worked out and submitted a plan to Morlan which he felt was the only possible solution, if the company were to avoid going into bankruptcy. Under that plan the company was to issue approximately *42 409,000 shares of stock, of which Morlan was to acquire 185,000 shares and Loel 185,000 shares. The remaining shares were to be issued to creditors in the cancellation of their indebtedness and to certain other individuals for government permits for the production of oil from stated properties. The shares of stock to be issued to Loel were to be in consideration for the transfer to the company of his Bankline contract. The shares to be issued to Morlan were to be in consideration for his payment of the notes of the company at the banks mentioned and in cancellation of the notes covering loans made by him directly to the company. As between Loel and Morlan, the agreement embodying their participation in the above plan was reduced to writing and signed by them under date of March 31, 1939. The said writing reads as follows: At present it is contemplated that 409.000 shares of stock of Burnoel Petroleum Company are to be issued. Of this amount we are each to receive 185.000 shares. the balance of the stock issued to be applied against creditors' claims, or the claims of other stockholders. Because of our mutual interest in working out the affairs of the Burnoel Petroleum Company, *43 we agree with each other that we will participate equally in any reorganization effected for the company. It is agreed Mr. A. F. Morlan is to assume notes of Burnoel Petroleum Company totaling $185,000.00 - and to accept for these, 185.000 shares of stock. Mr. Wayne Loel is to transfer to the Burnoel Petroleum Company the Bankline Contract valued at $185,000.00, accepting therefor 185,000 shares of stock. We agree with each other further, that in consideration for services rendered the Company by Walter M. Fagan, we will each transfer to him stock approximating 5 percent of the total amount issued, that is, if the plan of issuing 409,000 shares is carried out, we will each transfer to Walter M. Fagan 20,000 shares of stock. On April 12, 1939, Morlan paid the $155,000 note of Burnoel Petroleum Company held by the Security-First National Bank and a second note of the company for $700, dated March 9, 1939, held by the same bank, and pursuant to authorization from Morlan, Loel and McBurney, as guarantors of the notes, under date of February 24, 1939, and an authorization from Burnoel Petroleum Company in substantially identical terms, under date of April 11, 1939, the notes, together *44 with the collateral held by the bank for the said notes, were assigned by the bank to Morlan. At or about the same time Morlan also paid the $15,000 note of Burnoel Petroleum Company held by the Bank of America. To facilitate the carrying out of the Fagan plan, Morlan, upon the advice of Fagan, advanced approximately $20,000, which was used by Fagan to settle a number of claims against the company, on the basis of 42 cents on the dollar. On March 30, 1939, the company sold one of its wells for $20,000, and on April 29, 1939, the five wells previously described were sold for $40,000 and the proceeds applied on the claims of creditors. The $20,000 advanced by Morlan was subsequently repaid by the company in full. Pursuant to the plan worked out by Fagan, and previously agreed upon, the Burnoel Petroleum Company on May 12, 1939, filed its application with the Commissioner of Corporations for permission to issue 410,419 shares of its stock. The permit was granted under date of May 29, 1939, and the new stock was issued under date of June 5, 1939. Of the 185,000 shares to be issued in consideration of Morlan's payment of the company notes at the banks and the cancellation of the three *45 notes held by him against the company, 165,000 shares were issued to Morlan and 20,000 shares to Fagan. Instead of the 185.000 shares as originally agreed upon, 184.000 shares were issued in consideration of Loel's transfer to the company of his Bankline contract. Of the shares so issued, 128.000 were issued to Loel, 20,000 to Fagan, and 36,000 to W. O. Maxwell. Of the remaining 41.419 shares, 10.000 shares were issued to Phillips and 7,628 shares were issued to various individuals for certain government permits and leases, while the balance of 23,791 shares were issued in satisfaction of claims of creditors, on a dollar for dollar basis. Prior to the consummation of the Fagan plan, Burnoel Petroleum Company had on its books assets in the amount of $20,443.69, and liabilities, exclusive of capital stock, in the amount of $227,789.77. or an excess of liabilities over assets of $207,346.08. After the execution of the plan, and as of June 30, 1939, its balance sheet disclosed assets of $210,147.57, which assets included the Bankline contract at $184,000 and the government permits and leases at $7,628. Its liabilities, exclusive of capital stock, were disclosed at $19,718.01, or an excess *46 of assets over liabilities in the amount of $190,429.56. The capital stock liability was shown at one dollar per share, or $410,419. At the time of its transfer to Burnoel for stock, the Bankline contract had not commenced to pay dividends. All parties were of the opinion, however, that it had considerable potential value, and it was on the basis of its potential value that it was paid into Burnoel at $184,000. Its fair market value when so paid in for stock was substantially less than that amount. The Bankline contract began to pay dividends in the fall of 1939. The condition of Burnoel Petroleum Company was also improved by the successful development of one or more of its leases. The Burnoel stock issued in 1939 pursuant to and under the Fagan plan had a book value, as of the date of issue, of 46 cents per share. As shown by his return for 1939, Morlan, in computing his income, attributed a value to the 165,000 shares of Burnoel stock issued to him, as set forth above, of 50 cents per share. Morlan died on April 14, 1940, and at some undisclosed date subsequent to his death, the said 165.000 shares of Burnoel stock were sold by his estate to Loel for $70,000, or 42.42 cents per *47 share. The fair market value of Burnoel stock when acquired by Morlan was 30 cents per share. In Morlan's return for 1939 the transaction here in question was reported as follows: "Item 17 - Bad Debt: Taxpayer was compelled to pay notes of Burnoel Petroleum Co. which he had endorsed. The amount of this liability was $185,000. In satisfaction of its liability to taxpayer by virtue of his right of subrogation, the Burnoel Petroleum Co. issued to him 165,000 shares of its Capital Stock which had a value of $82,500. Loss to taxpayer was $102,500.00." In his determination of deficiency, the respondent disallowed the bad debt deduction of $102,500 claimed by Morlan on his return, as described in the preceding paragraph, and in his notice of deficiency stated that "The bad debt deduction of $102,500.00 claimed in the return is disallowed because there was no ascertainment of worthlessness of debt within the year." Opinion As shown in our findings of fact, Morlan in his return treated the $185,000 represented by the three notes of Burnoel held by him and the amounts paid by him on the notes of Burnoel held by the two banks as indebtedness owing to him and claimed a bad debt deduction *48 of $102,500, that amount being the difference between the $185,000 and $82,500, the latter amount being represented as the value of the 165,000 shares of Burnoel stock received as the sole and only payment on such indebtedness. The petitioner has abandoned the claim of bad debt, and in the petition, at the hearing and on brief, has contended that the transaction whereby Morlan received 185,000 shares of Burnoel stock was an exchange, resulting in a deductible loss. The question of loss is the only question presented for decision. It is the contention of the petitioner that the $155,000 paid by Morlan in satisfaction of the Burnoel note at the Security-First National Bank and the $15,000 paid on the note at the Bank of America represented cost to Morlan of the original 25 shares of Burnoel stock acquired by him in 1937; that in effect the said 25 shares of stock, having a cost basis of $170,000, as indicated, and the three notes of Burnoel for $5,000 each held by Morlan were exchanged for 185,000 shares of Burnoel stock, which shares had a fair market value not in excess of 20 cents per share, and that the difference represented a deductible loss to Morlan in the year of such exchange. *49 The difficulty with the contention of the petitioner, in so far at least as it relates to the $170,000 paid by Morlan on Burnoel's notes at the banks, is that it is not supported by the facts. Morlan acquired the 25 shares of Burnoel stock in 1937, in consideration for his promise to guarantee notes of Burnoel which might be given to obtain money for the development of its leases. At no time was there any unqualified liability on the part of Morlan to pay any amount for the said shares of stock or to make payment of any amount for the account of Burnoel. His was a secondary, not a primary liability. At no time prior to the agreement reached in 1939, whereunder and whereby he was to pay the notes at the banks and in consideration therefor was to receive 170,000 shares of Burnoel stock, did Morlan pay any amount in respect of the said notes or unqualifiedly agree to pay any amount. At no time was he called upon to make good on his endorsement and guaranty of the notes, and it is apparent from the facts that if he had been so required to make good on his guaranty, the amount which he would have been required to pay would most likely have been substantially less than the $170,000 paid *50 in 1939, pursuant to and under the agreement growing out of the Fagan plan. Loel and McBurney were joint guarantors with Morlan on the $155,000 note at the Security-First National Bank, and the bank held as collateral the leases of Burnoel, which later sold for $40,000, a contract between Burnoel and Standard Oil Company and Loel's Bankline contract, which had substantial value. It matters not, we think, in the absence of the Fagan plan to rehabilitate Burnoel, or some other plan, that Morlan would likely have been required to pay some amount as guarantor of the Burnoel notes or that such amount, if so paid, may properly have been regarded as cost or additional cost to him of the 25 shares of Burnoel stock acquired in 1937. The facts are that he never at any time was called upon to make good on his guaranty of those notes, but paid them under a different and separate transaction and in consideration for 170,000 new shares of Burnoel stock on a dollar for dollar basis. Estate of L. W. Mallory, 27 B.T.A. 750, accordingly is not in point. If of interest at all, that case will have applicability in computing the gain or loss realized or sustained upon the *51 sale or other disposition of the new shares of stock acquired by Morlan in 1939. As to the payment of $170,000, the petitioner's claim of loss is denied. With respect to the three Burnoel notes for $5,000 each held by Morlan and by him surrendered for 15,000 shares of Burnoel stock, the situation is different. Separate from and not as a part of the agreement under the Fagan plan, three loans of $5,000 each had been made to Burnoel by Morlan and constituted claims against the company, evidenced by the three notes. The money was not paid over in consideration for the 15,000 shares of new stock, but rather the 15,000 shares of stock were received in consideration for the exchange or cancellation of the three notes. Accordingly, under section 111 of the Internal Revenue Code, Morlan sustained a loss equal to the excess of the loans over the value of the stock received, and under section 112(a) the loss sustained is to be recognized, except and unless the exchange falls within the provisions of section 112(b). The petitioner contends that the exchange in question does not come within any of the provisions of section 112(b) and the respondent does not contend otherwise. He lumps the $15,000 *52 represented by the notes with the $170,000 paid to the banks as the price paid for the 185,000 shares of stock, and argues that no gain or loss transaction occurred. As to the notes now under consideration, the facts support the contention of the petitioner. The transaction was not a mere purchase of stock but an exchange of a note claim therefor whereby Morlan did sustain, in 1939, a loss equal to the difference between the face of the three notes, or, in other words, the amounts loaned, and the fair market value of the 15,000 shares of Burnoel stock received therefor, and the notes so exchanged having been held by him for a period of less than 18 months, the entire amount of loss must be taken into account in computing net income. Decision will be entered under Rule 50.